**Roslyn WARREN, Appellant**

v.

**Karen WINKLE and Joseph Winkle, Appellees.**

**No. 2012–CA–000366–MR.**

Court of Appeals of Kentucky.

May 24, 2013.

---

Jasper D. Ward, IV, A. Layne Stackhouse (argued), Louisville, KY, for appellant.

Deanna M. Tucker (argued), Louisville, KY, for appellees.

Before MAZE, STUMBO and THOMPSON, Judges.

## OPINION

THOMPSON, Judge:

Roslyn Warren appeals a summary judgment of the Jefferson Circuit Court in her action against Karen and Joseph Winkle as a result of injuries she allegedly sustained when the ceiling in an apartment she rented from the Winkles collapsed. She alleges that: (1) the circuit court improperly applied the summary judgment standard; (2) the circuit court erred when it found that the Winkles could not be liable for injuries caused by a defect in the area between the apartment's ceiling and roof; and (3) the circuit court erred when it concluded that under Kentucky law, a tenant cannot recover damages for personal injuries caused by a landlord's failure to repair. After careful consideration of the applicable law, we reverse and remand.

In the spring of 2008, Warren entered into an oral week-to-week lease with the Winkles for a one-bedroom apartment in a seven-unit apartment complex. All seven units were within a one-story building and shared a common roof. Each apartment had ceiling tiles suspended from the ceiling with metal tees and ells that covered the area between the ceiling and roof that consisted only of rafters and was not a space useable by tenants.

Warren alleges that on July 19, 2008, part of the bedroom ceiling collapsed while she was in bed, causing injuries to her cervical spine and a torn rotator cuff. In her deposition, Warren testified that when she moved in, she noticed that the ceiling and a light fixture above her bedroom were sagging and notified Karen who assured her it would be repaired. On several subsequent occasions, she requested that the defect be repaired and also notified Karen that when it rained, other portions of the ceiling sagged, indicating a leak in the roof.

Karen was deposed and denied that there was any conversation between her and Warren concerning the ceiling and testified she had no knowledge of a problem with the roof leaking. However, she recalled that just days prior to the alleged ceiling collapse, she and Joseph were in Warren's unit to replace a toilet and noticed one of the ceiling tiles sagging. Neither believed it to be a dangerous condition and advised Warren that they would return to tighten the wire for that area of the ceiling.

After the alleged incident, Warren notified Karen of the collapsed ceiling. Karen testified that when she went to the apartment she noticed tiles, dust, and insulation on the floor.

Warren testified that she was moved to another apartment in the same building and that its ceiling also sagged when it rained. She further testified that Karen told her that the ceiling would not be repaired until the entire roof was replaced. Karen denied making any statement regarding the roof needing repair. However, the entire roof was replaced in 2009, which Karen attributed to age and storm damage.

In addition to the parties' depositions, the record also contains a report submitted by John Schoering, a certified safety professional retained by Warren as an expert. His report indicated that the ceiling collapsed because of the lack of a vapor barrier, which allowed rainwater from the leaky roof to accumulate in the area between the roof and ceiling.

Warren filed her complaint against the Winkles alleging that the Winkles failed to maintain the roof in a reasonably safe condition causing moisture to accumulate between the roof and ceiling resulting in the collapse of the ceiling and requested damages for personal injuries. Following the parties' depositions, the Winkles moved for summary judgment arguing that the collapsed ceiling occurred in Warren's apartment, an area under her exclusive control and, therefore, as a matter of law, they were not liable. Warren filed a response arguing that the roof and the area between the roof and ceiling were in the Winkles' exclusive control requiring them to maintain it in a reasonably safe condition and repair any known and dangerous defects. Following a hearing, the circuit court issued a summary judgment in the Winkles' favor holding that, as matter of law, the Winkles had no duty to maintain the roof or the area between it and the ceiling.

The question on appeal "when a trial court grants a motion for summary judgment is whether the trial court correctly found there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Hallahan v. The Courier–Journal*, 138 S.W.3d 699, 704 (Ky.App.2004). Summary judgment is not a substitute for trial and all doubts must be resolved in the nonmovant's favor. *Id.* at 705. The proper inquiry is "whether, from the evidence of record, facts exist which would make it possible for the nonmoving party to prevail." *Id.* Because a summary judgment involves only legal issues, our review is *de novo. Id.*

As an initial matter, we address Warren's reliance on the subsequent repair of the roof as evidence of the alleged defect in the roof. Evidence of certain remedial measures is not admissible to prove negligence, *Triplett v. Napier*, 286 S.W.2d 87, 89 (Ky.1956). Public policy dictates that parties feel free to take such measures without concern for any possible court action. Although Warren recognizes the general rule, she contends that evidence concerning the subsequent roof repair was admissible under Kentucky Rules of Evidence (KRE) 407 to demonstrate the Winkles' control over the roof and, therefore, properly considered in response to the Winkles' motion for summary judgment. For the purpose of our review of the circuit court's summary judgment, we do not believe it necessary to address the parties' arguments. Whether the Winkles made a subsequent repair to the roof does not factor into our analysis regarding their control over the roof and the area between it and the ceiling.

"Negligence, as used in law, may be defined as the failure to discharge a legal duty, whereby injury occurs. There can be no negligence where there is no duty imposed." *Franklin v. Tracy*, 117 Ky. 267, 77 S.W. 1113, 1115 (1904) (internal quotations omitted). In the context of landlord-tenant relationships, the general rule is "a landlord is not liable for injuries to the tenant or his property because of defects in the leased premises in the absence of a contract or warranty as to the condition of the premises or to repair same, and where the landlord is guilty of no fraud or willful wrong." *Clary v. Hayes*, 300 Ky. 853, 858, 190 S.W.2d 657, 659 (1945) (quoting *Lindsey v. Kentucky Development Company*, 291 Ky. 253, 163

S.W.2d 499, 500 (1942)). As a purchaser of an estate of land, the lessee is subject to the rule of caveat emptor: "[T]he tenant takes the premises for better or worse." *Id.* However, as with most general rules, it is not absolute and there are exceptions. Warren contends that the common area exception applies to her case.

■■■■ "[T]here is a critical distinction between properties leased wholly by one tenant and properties leased by numerous tenants." *Jaimes v. Thompson,* 318 S.W.3d 118, 119 (Ky.App.2010). In *Davis v. Coleman Management Co.,* 765 S.W.2d 37, 38–39 (Ky.App.1989), the Court noted that Kentucky has adopted the rule as stated in the Restatement (Second) of Torts § 360 (1965), which provides:

> A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sub-lessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.

When a lessor leases a multifamily dwelling and a portion of the demised premises is retained by the landlord for the common use and benefit of a number of tenants, the landlord must exercise ordinary care to keep common areas in a reasonably safe condition. The reason for the exception and its application was explained early in our jurisprudence.

> Where a landlord leases separate parts of the same building to different tenants and retains exclusive control of certain portions thereof, such as steps, stairways, halls, etc., which are used in common by all the tenants, the landlord is under an implied obligation to use reasonable diligence to keep such reserved parts in safe condition for the use of the tenants. As to the portion of the premises which he has leased, the landlord is exempt from liability to repair both as regards the tenants and third persons, for the reason that he has surrendered to his tenants exclusive possession and control of the respective leased premises. The parts of a building which are subject to the necessary use which the tenants may make of them in connection with their enjoyment of the possession and use of their separate apartments must be kept in repair by the landlord, not because of any contract on his part, express or implied, but because of the supervision and control which he still retains over all parts of the premises not expressly demised to his tenants. In other words, his responsibility arises from negligence.

*Home Realty Co. v. Carius,* 189 Ky. 228, 224 S.W. 751, 751–752 (1920). It is an exception based on common sense: "The landlord is the only person who has control over the common areas, and if the landlord does not take reasonable steps to make such areas reasonably safe, then no one will." *Davis,* 765 S.W.2d at 39. In the absence of proof to the contrary, a landlord is presumed to have retained control over premises used in common by different tenants. *Mackey v. Allen,* 396 S.W.2d 55, 59 (Ky.1965).

The Winkles argue that the common area exception cannot apply in this instance because Warren was injured in her apartment by falling ceiling tiles and, therefore, injured in an area under her exclusive control. We agree with the Winkles that the area inside Warren's apartment, including the ceiling, was not a com-

mon area. It was not an area used by all tenants or necessary to their enjoyment of their individual apartments. Nevertheless, we conclude that genuine issues of material fact exist that preclude summary judgment.

Warren does not allege that the defect was in the ceiling. Her contention is that the roof needed repair, that the Winkles knew about its condition, and that the leaky roof created a dangerous condition in the area between the roof and ceiling. We conclude that the Winkles' liability is not precluded by the general rules applicable to a landlord's liability. Again, persuasive authority is found in the Restatement (Second) of Torts.

The Restatement (Second) of Torts § 361 (1965) states:

A possessor of land who leases a part thereof and retains in his own control any other part which is necessary to the safe use of the leased part, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care.

(a) could have discovered the condition and the risk involved, and

(b) could have made the condition safe.

Comment b states the rule "applies to the maintenance of walls, roofs, and foundations of an apartment house or office building."

Jurisdictions that have addressed the issue have held that the roof of a building is not part of the demised premises. The prevailing view is that a "roof is necessary for all the tenants; and, no provision being made for a transfer of its possession to any tenant, the control over it remained in the owner." *Leuch v. Dessert,* 137 Wash. 293, 295, 242 P. 14, 15 (1926). In *Germansen v. Egan,* 130 Pa.Super. 21, 25, 196 A. 881, 883 (1938), the Court offered further explanation for the rule: "The roof of a building rented to different tenants is not leased to the tenant of the floor just below it, but remains in the control of the landlord, and the latter is responsible for damages naturally resulting from its negligent maintenance." In *Archibald v. Fidelity Title & Trust Co.,* 296 S.W. 680 (Tex.Civ.App. 1927), the Court considered whether a landlord could be liable for damages caused by the failure to keep the roof and water drains in proper repair. The Court held that the plaintiffs stated a cause of action against the landlord and quoted the rule stated in Underhill on Landlord and Tenant § 489:

The landlord who retains the supervision and control of the roof of premises which are let out to several tenants in separate apartments is responsible for its condition and liable if he shall prove negligent. As to the liability of the landlord of a tenement house as regards the condition of the roof, it has been held he is bound to exercise reasonable care and prudence to keep the roof of premises which are rented by him to tenants occupying separate apartments in a reasonably safe condition.

*Id.* at 682 (internal quotations omitted). The Court noted that this is the rule followed by "the great weight of authority." *Id.*

The Winkles contend that Kentucky long ago rejected the view that a landlord is liable for known defects in the structural components of premises leased to multiple tenants. As authority, they cite *Miles v. Tracey,* 28 Ky. L.Rptr. 621, 89 S.W. 1128 (1906), where the Court rejected the argument that the landlord in that case was liable for damages caused to a tenant by a

collapsed wall. We have carefully read that case and conclude it has little persuasive value.

The Court merely held that the pleadings were insufficient to allege that the landlord retained possession and control of the walls without further explanation or basis for its holding. It offers little insight regarding the content of those pleadings except as follows: "There was no allegation that the defective condition of the building was known to the landlords, or that the defect was concealed or warranted against by them." *Id.* at 1129. Here, Warren has alleged that the Winkles knew that the roof was leaking and that the ceiling in her apartment was sagging. We do not believe that the holding in *Miles* is contrary to the view expressed in the Restatement or the case cited.

■ We conclude the best reasoned view, and that consistent with the modern trend in landlord-tenant relationships, is absent a contrary agreement, a landlord can be responsible for dangerous conditions in areas not demised to a tenant and that remain in the landlord's exclusive control. In this case, Warren did not have the right to use or enjoy the roof and had no responsibility to maintain it in a reasonably safe condition. Furthermore, the area between the roof and ceiling was not useable and was, in fact, merely a part of the roof structure.

■ The Winkles contend that even if the area remained in their exclusive control, the condition of the ceiling was open and obvious and, therefore, they cannot be liable. Generally, "a tenant takes the premises as she finds them" and "a landlord will not be liable for injuries caused by defects in the leased premises unless the condition is unknown to the tenant and not discoverable through reasonable inspection." *Miller v. Cundiff,* 245 S.W.3d 786, 788 (Ky.App.2007). Based on the

general law cited, the Winkles contend that because Warren testified that prior to the ceiling collapse she was aware the ceiling was sagging, its condition was obvious and known to her and they cannot be liable for her injuries. We disagree.

■ As noted in Comment a to the Restatement (Second) of Torts § 361 (1965), a tenant's knowledge of a dangerous condition will not absolve the landlord from liability. This is consistent with Kentucky law applicable to a landlord's duty to keep common areas in a reasonably safe condition, which is equally applicable when the landlord retains exclusive control of an area.

In *Davis,* the Court held that the open and obvious doctrine did not preclude recovery when the common area exception applied. It was pointed out that the rule "does not impose an undue burden on the landlord" and "[t]he landlord's actions should be evaluated according to what is reasonable under all the circumstances." *Davis,* 765 S.W.2d at 39. Turning to the factors to be considered, the Court emphasized that "[t]he landlord's actual or constructive notice of the hazardous conditions is, of course, a significant factor" as well as the opportunity to remedy the defect and the reasonableness of the tenant's actions. *Id.* Although the Winkles' conduct and Warren's conduct will be subject to a reasonableness test, Warren's mere knowledge of a defect in the ceiling does not preclude her recovery.

Finally, the Winkles contend that even if they were negligent, Warren could only recover the cost of repair if she had made any and not for her personal injuries. They rely on *Pinkston v. Audubon Area Community Services, Inc.,* 210 S.W.3d 188 (Ky.App.2006), and *Miller,* 245 S.W.3d 786. Both are distinguishable from this case.

In *Pinkston,* this Court held that the breach of a repair agreement does not extend the landlord's liability beyond the cost of repair because at common law, "the breach of a repair agreement does not extend the landlord's liability beyond damages outside of the reasonable contemplation of the parties." *Pinkston,* 210 S.W.3d at 190. In *Miller,* the tenant sought to impose liability under the Uniform Residential Landlord Tenant Act (URLTA) Kentucky Revised Statutes (KRS) 383.500, *et. seq.* for the failure to repair a gap in her carpet that caused her to fall and sustain injuries. The Court held "that to the extent the URLTA imposes a duty on landlords to make repairs to leased premises, the landlord's liability for breach of that duty does not extend beyond that authorized at common law for breach of a contractual duty to repair." *Miller,* 245 S.W.3d at 789.

Both cases involved a defect inside the rented premises in an area under the tenant's exclusive control and the landlord's duty to repair. The crucial distinction is that the Winkles retained exclusive control of the roof and the area between it and the ceiling. This is an action for negligence, not breach of contract or an action under the URLTA.

■■■ Our holding does not impose a heavy burden on a landlord. "The landlord is not a guarantor of the tenant's safety." *Davis,* 765 S.W.2d at 39. The Winkles can only be liable if they had actual or constructive notice of a defective condition. *Pease v. Nichols,* 316 S.W.2d 849, 851 (Ky.1958). Moreover, they can only be liable for a defect that is dangerous and that they knew or should have known was dangerous. Any confusion in the law was clarified in *Nash v. Searcy,* 256 Ky. 234, 75 S.W.2d 1052, 1055 (1934), where it is stated:

[T]he law does not require the landlord in such cases to maintain such parts of his building in the same perfect condition of repair as when first constructed, and when they were completely new. On the contrary, it recognizes that every day's use of such parts of the rented building produces some disrepair and that the aggregate of it in the course of time may result in some change or alteration different from that existing at the time the contrivance was first constructed, but which nonrepair may still be within the domain of what is considered "reasonably safe," and as not having reached the point of producing a "dangerous condition."

■■■ Although the circuit court improperly granted summary judgment on the issue of whether the Winkles retained exclusive control of the roof and the area between it and the ceiling, Warren must prove that the Winkles knew or should have known that a dangerous condition existed. The alleged leaky roof was not, by itself, a dangerous condition and only became hazardous if moisture accumulated between it and the ceiling. Therefore, the Winkles can only be liable if they knew or should have known that the roof was leaking and that a defect in the area immediately beneath it caused moisture to accumulate creating a danger that the ceiling would collapse.

Based on the forgoing, the summary judgment of the Jefferson Circuit Court is reversed and the case remanded for further proceedings.

ALL CONCUR.